# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:07CR214 |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| SAIDJON IBRAGIMOV, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the Motion to Suppress Statement [58] filed by the defendant, Saidjon Ibragimov. An evidentiary hearing was held on October 5, 2007. The hearing transcript [87] was filed on October 24, 2007, at which time the motion was deemed submitted.

## ISSUES PRESENTED

Defendant, a citizen of Tajikistan, was arrested on June 13, 2007 by agents of the Department of Homeland Security and the Nebraska State Patrol and was interviewed at that time. He contends his statements were not freely and voluntarily given because he was not offered the assistance of an interpreter, was not informed of his constitutional rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and was not offered the assistance of an attorney, all in violation of his rights under the Fifth and Sixth Amendments to the U.S. Constitution. In the alternative, defendant argues his statement should be suppressed because he was denied his right to consular notification under article 36 of the Vienna Convention.[1]

---

[1] Vienna Convention on Consular Relations, 1969 WL 97928, T.I.A.S. No. 6820, 21 U.S.T. 77.

The government concedes that consular notification was not given; however, the remedy of suppression is not available for a violation of article 36 of the Vienna Convention. As to the defendant's constitutional challenges, the government contends the defendant's statements were voluntarily given, as he is proficient in the English language, was given his *Miranda* rights prior to the interview, understood his rights, voluntarily waived his right to counsel, and voluntarily gave a statement.

## FACTUAL BACKGROUND

Special Agent Brent Morral has been employed by Immigration and Customs Enforcement (ICE) for approximately three and one-half years and investigates violations of the United States customs and immigration laws. On approximately November 30, 2006, ICE commenced an investigation of the defendant, who was suspected of harboring of illegal aliens, transporting illegal aliens, and bribery. Morral was the case agent.

During the six-month investigation, ICE used a cooperating witness (CW), an employee for the Department of Motor Vehicles. The CW had reported to law enforcement that the defendant tried to bribe her to help him obtain drivers' licenses for illegal aliens. The investigators recorded 15 to 20 conversations between the CW and the defendant. The CW had known the defendant for about one year because he acted as a translator for Tajikistan nationals who were attempting to get their drivers' licenses.

During his investigation, Morral determined that the defendant entered the country on or about July 4, 2004 on an F1 student visa. He became a conditional resident when he

married a U.S. citizen and was a conditional resident at the time of his arrest. Defendant's wife is a United States citizen and English is her native language.

ICE set up between 15 and 20 monitored meetings or telephone calls between the CW and the defendant over the six-month course of the investigation. All but one of the meetings were recorded and Morral listened to all the recordings. The recorded meetings were conducted in English and Morral was able to understand the comments made by the defendant and by the CW, and the defendant's responses were appropriate to the comments made to him by the CW.

A meeting of significance occurred on June 11, 2007 at a Burger King located at 30th and Forest Lawn Avenue. The CW was wearing a wire, and the meeting was recorded. The purpose of the meeting was for the defendant to provide money to the CW. Morral testified he was able to understand both of the speakers on this recording (Ex. 2), although the recording was, at times, difficult to understand in that the defendant spoke softly. The conversation lasted six minutes and 20 seconds.

The court has listened to the recording (Ex. 2) and finds that the conducted the conversation in English and his responses were appropriate to the statements the CW made to him in English.

The defendant and 14 other people were arrested on June 13, 2007, at approximately 12:00 noon. A Nebraska State Patrol officer conducted a traffic stop and arrested the defendant near Interstate 480 as he was leaving the DMV. Four more people were arrested

in a traffic stop on 30th Street. The other individuals were arrested behind the DMV at 30th and Forest Lawn Avenue. Different law enforcement teams were charged with arresting different sets of people.

Defendant was arrested without incident after the traffic stop. ICE Agent Charles Bautch transported him to the ICE district office, where he was placed in a detention cell by himself. Agent Morral testified that the detention area at the district office had eight holding cells and eight processing areas with computers. Each detention cell has its own bathroom, water fountain, and television. The people who were arrested on June 13, 2007 were offered food during their time at the ICE detention area.

The defendant was interviewed at approximately 6:15 p.m. by Agent Morral and State Patrol Investigator Charlie O'Callahan, about six hours after his arrest. The interview was delayed due to the number of people arrested that day and because Morral was obtaining a federal search warrant for the defendant's residence.

Neither the Tajikistan Consulate nor the Tajikistan Embassy was notified before the defendant was interviewed. Agent Morral acknowledged on cross-examination that the Vienna Convention required that the Consulate Office of Tajikistan be notified if any of their nationals were arrested, and would not "quarrel" with defense counsel's statement that the Vienna Convention "requires authorities to notify all detained foreigners without delay of their right to Consulate and have their Consulate informed of the detention." (25:6-10). Morral explained that he has arrested many foreign nationals but never advises them of their

right to Consulate because that is the function of the ICE detention office. (26:13-19). The U.S. Marshal's Office and the U.S. Attorney's Office did notify the Consulate after the defendant appeared in court; however, it did not appear that ICE itself made any notification. (28:3-17).

Defendant was interviewed by Morral and O'Callahan in an interview room in the ICE detention area. The officers were armed, but were not in uniform and did not remove their weapons from their holsters. The defendant was not restrained in any way. The interview lasted about 20 minutes and was not recorded.

Morral first identified himself and told defendant he was under arrest for harboring illegal aliens, transporting illegal aliens and for bribery. The defendant appeared to be nervous but was calm; he was not crying. According to Morral, he and O'Callahan were calm and spoke to the defendant in a conversational tone of voice. They did not place hands on defendant at any time during the interview.

Agent Morral testified that they advised defendant of his *Miranda* rights from a Statement of Rights form used by ICE. (Ex. 1). The entire interview, including the rights advisory, was conducted in English. Defendant responded in English, and Morral had no difficulty at all understanding the defendant's responses. Defendant was advised of his rights, as follows:

> "Before we ask you any questions, it is my duty to advise you of your rights. You have the right to remain silent. Do you understand this?"
> Mr. Ibragimov stated that he did understand this.

> "Anything that you say can be used against you in court or other proceedings. Do you understand this?"
>
> Mr. Ibragimov stated that he did understand this.
>
> "You have the right to consult an attorney before making any statement or answering any questions. Do you understand this?"
>
> Mr. Ibragimov stated that he did understand this.
>
> "You have a right to have an attorney present with you during questioning. Do you understand this?"
>
> Mr. Ibragimov stated that he did understand this.
>
> "If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish. Do you understand?
>
> Mr. Ibragimov stated he did understand this.
>
> "If you decide to answer questions now, you still have the right to stop the questioning at any time or to stop the questioning for the purpose of consulting an attorney. Do you understand this?"
>
> Mr. Ibragimov stated that he did understand this.

(18:23-19:18). Morral asked the defendant at that point if he was willing to speak with the officers. Defendant stated that he was willing to talk with them. Agent Morral then dated and signed the form (Ex. 1), and the defendant also signed the form. Morral also gave defendant a chance to read the form and testified he believed the defendant did read the form.

According to Agent Morral, defendant did not ask for a lawyer and did not ask to have the interview stopped. Neither of the officers made any promises that waiving his rights would result in any type of benefit or advantage to the defendant. Nor did either officer ever use any force or threats of any kind to get defendant to waive his rights.

The tone of the interview was conversational. Agent Morral asked most of the questions and Mr. O'Callahan also asked a couple of questions. The defendant's demeanor did not change at all during the interview. When asked questions in the English language,

the defendant gave appropriate responses and appeared to understand the English language. It appeared to Agent Morral that the defendant was freely and voluntarily waiving his rights, as explained to him on the *Miranda* rights advisory form.

Defendant, Saidjon Ibragimov, testified through an interpreter at the suppression hearing. When asked, "What does, 'You have the right to remain silent' mean to you?" he responded, "I don't know how to explain it. I cannot – I might not say anything, and if I do, something might happen to me. That's how I understand it." (30:7-11). He testified that the lawyers in Tajikistan are generally government officials: "If we call them, we have to say that we are guilty right away. Then they will try to help us. It's not like here in America." (30:12-22). If he were in Tajikistan and refused to sign a paper when asked to do so, he would be beaten up and all bloody; he would have to sign it. He did not know what would happen here if he refused to sign the paper, and was afraid of what might happen. (31:5-14). When he agreed to speak to the officers he did not know the law and thought a lawyer in the United States was no different than a lawyer in Tajikistan.

The defendant further testified to the effect that he was also charged in state court and did not fully understand counsel's advice that he could either have or waive a preliminary hearing. He did not understand the meaning of the word "waive" until counsel explained it to him. He testified that he sometimes says he understands things when he does not because he is "kind of ashamed to say that I don't understand. It looks like I am stupid." (32:16-33:9).

On cross-examination defendant admitted he had been in the United States for three years and had studied English for one year before he came to the United States. He has been married to an English speaking American citizen for over two years. His wife does not speak Russian or Farsi. He admitted that all of his conversations with the woman from the DMV were in English, and he met her because he was translating for people who didn't speak English at the DMV. Defendant then testified that he understood about half the questions asked by Agent Morral. He did tell Agent Morral that he understood the questions: "I said I understood because I couldn't say I didn't." (35:1-3).

## LEGAL ANALYSIS

### A. Rights Advisory

Defendant Ibragimov was under arrest and in police custody when his statements were made. The protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), are triggered when a defendant is both in custody and being interrogated. *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992).

The testimony of Agent Morral is uncontroverted, and the court finds his testimony to be credible. The record shows that the defendant was, in fact, advised of his *Miranda* rights in English before any questioning began.

Defendant argues, in turn, that he did not understand his rights, if given, because he is not fluent in English. The record shows, however, that defendant studied English for one year before coming to the United States three years ago. He was known for serving as an

English language interpreter at the DMV, translating for people who did not speak English. His wife of two years speaks English, and apparently does not speak the defendant's native language. He conducted business entirely in English with the CW during the six months preceding his arrest, and Exhibit 2 demonstrates that he was able to conduct a fairly complex conversation in English. The defendant does not complain of police misconduct, and there is no evidence of physical coercion. As to voluntariness, there is no evidence showing that the defendant's will was overborne, or that he was otherwise coerced, deceived, or promised anything in return for signing the consent form. *See United States v. Syslo*, 303 F.3d 860, 865-66 (8th Cir. 2002) (To determine whether a waiver was voluntary, the court considers the totality of the circumstances and must determine whether the individual's will was overborne.).

Considering these factors, I find that the defendant was given his *Miranda* rights, that he understood his rights, and, knowing his rights, agreed to talk to the investigating officers without an attorney present.

### B. Vienna Convention

Assuming, without deciding, that article 36 of the Vienna Convention required law enforcement to give consular notification before interviewing the defendant, the court agrees with the government that the exclusionary rule does not apply to violations of the Vienna Convention. In *Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2680 (2006), the Court observed:

> The violation of the right to consular notification ... is at best remotely connected to the gathering of evidence. Article 36 has nothing whatsoever to do with searches or interrogations. Indeed, Article 36 does not guarantee defendants any assistance at all. The provision secures only a right of foreign nationals to have their consulate informed of their arrest or detention–not to have their consulate intervene, or to have law enforcement authorities cease their investigation pending any such notice or intervention. In most circumstances, there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police.
>
> Moreover, the reasons we often require suppression for Fourth and Fifth Amendment violations are entirely absent from the consular notification context. We require exclusion of coerced confessions both because we disapprove of such coercion and because such confessions tend to be unreliable. *Watkins v. Sowders*, 449 U.S. 341, 347 (1981). We exclude the fruits of unreasonable searches on the theory that without a strong deterrent, the constraints of the Fourth Amendment might be too easily disregarded by law enforcement. *Elkins v. United States*, 364 U.S. 206, 217 (1960). The situation here is quite different. The failure to inform a defendant of his Article 36 rights is unlikely, with any frequency, to produce unreliable confessions. And unlike the search-and-seizure context–where the need to obtain valuable evidence may tempt authorities to transgress Fourth Amendment limitations–police win little, if any, practical advantage from violating Article 36. Suppression would be a vastly disproportionate remedy for an Article 36 violation.

*Sanchez-Llamas v. Oregon*, 126 S.Ct. at 2861 (parallel citations omitted).

"The exclusionary rule is a judicially fashioned remedy aimed at deterring constitutional violations, the application of which is appropriate when the Constitution or a statute requires it." *United States v. Abdi*, 463 F.3d 547, (6th Cir. 2006), *cert. denied*, 127 S. Ct. 2910 (2007) (citing *Sanchez-Llamas*, 126 S.Ct. at 2680). The Vienna Convention does not require the suppression of evidence for a violation of article 36, and the defendant has

not demonstrated any constitutional ground or other reason why his statement should be suppressed based on a violation of the Vienna Convention.

## RECOMMENDATION

**IT IS RECOMMENDED** that the defendant's Motion to Suppress Statement [58] be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing an "Objection to Report and Recommendation" within ten (10) business days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED November 16, 2007.**

                                              **BY THE COURT:**

                                              **s/ F.A. Gossett**
                                              **United States Magistrate Judge**